# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

IN THE MATTER OF TWO          )
ADMINISTRATIVE SUBPOENAS      )
*DUCES TECUM* SERVED UPON       )          **Docket No. 05-MC-29-P-DMC**
STEVEN P. AMATO, D.C.,        )
ON JANUARY 25, 2005          )

# MEMORANDUM DECISION AND ORDER
# ON MOTION TO QUASH

Steven P. Amato, D.C., moves to quash two administrative subpoenas *duces tecum* served

upon him during execution of a search warrant at his Damariscotta, Maine chiropractic office on

January 25, 2005.  *See* Dr. Amato's Motion To Quash Two Administrative Subpoenas *Duces Tecum*

Compelling Production of Documents and Tangible Items Concerning Mainecures.com, Inc., and Dr.

Steven Amato, D.C., P.C., etc. ("Motion") (Docket No. 2).  For the reasons that follow, the Motion is

granted with respect to a paragraph in both subpoenas commanding production of certain computer-

related items and otherwise denied.[1]

## I.  Backdrop

Dr. Amato is a chiropractor who is the sole proprietor of a health-care practice based in

Damariscotta, Maine.  *See* Motion at 2, ¶ 1.[2]  On January 24, 2005 United States Magistrate Judge

William S. Brownell issued a warrant authorizing the search of the office and storage areas (and

---

[1] Dr. Amato sought oral argument with respect to the instant motion.  *See* Motion at 1.  Inasmuch as the parties' papers provide a sufficient basis on which to decide the motion, the request is denied.

[2] Neither the government nor Dr. Amato contests the background facts recited by the other.  *See* Government's Opposition to Dr. Steven Amato's Motion To Quash Two Administrative Subpoenas *Duces Tecum* Compelling Production of Documents and Tangible Items Concerning Mainecures.com, Inc., and Dr. Steven Amato, D.C., P.C., etc. ("Opposition") (Docket No. 6) at 1-3; *see generally* Dr. Amato's Reply to the Government's Memorandum of Law in Opposition to the Motion To Quash Two Administrative Subpoenas, etc. ("Reply") (Docket No. 11).  Hence, for purposes of resolution of the instant motion, I accept them at face value even (*continued on next page*)

certain motor vehicles, if present) utilized by Dr. Amato at 17 Water Street in Damariscotta. *See id.* ¶ 6. The search warrant required executing officers to seize any items "constituting evidence, fruit, and/or instrumentalities of the crimes" described in 18 U.S.C. §§ 1347 (Health Care Fraud), 1035 (False Statements Relating to Health Care Matters) and 1341 (Frauds and Swindles; Mail Fraud). *See id.* ¶ 7; *see also* 18 U.S.C. §§ 1035, 1341, 1347.

Pursuant to the search warrant, Federal Bureau of Investigation ("FBI") special agent Marco Trevino and other law-enforcement officers conducted a search of Dr. Amato's office and a vehicle located at the Water Street address on January 25, 2005. *See* Motion at 3, ¶ 8. While on the premises at Water Street in connection with that search, Trevino served two identical administrative subpoenas *duces tecum* upon Dr. Amato requiring production of documents and tangible objects by Mainecures.com, Inc. ("Mainecures") and Dr. Steven Amato, D.C., P.C. ("Amato P.C."). *See id.* ¶ 9; *see also* Subpoena Duces Tecum to Custodian of the Records, Mainecures.com, Inc., Exh. 3 thereto; Subpoena Duces Tecum to Custodian of the Records, Dr. Steven Amato, D.C., P.C., Exh. 4 thereto (both, "Subpoenas"). The search resulted in the seizure of approximately two boxes of paper records that included both corporate records and records of Dr. Amato's sole proprietorship. *See* Opposition at 2. Many of the seized documents appear to be corporate records of Mainecures or Amato P.C. *See id.* n.2; Exhs. 1-2 thereto.

Mainecures was formed as a Maine corporation on September 21, 2002 and was administratively dissolved for failure to file its 2003 annual report effective October 1, 2003. *See* Motion at 2, ¶ 2; Exh. 1 thereto. Dr. Amato was the clerk of Mainecures during its corporate lifespan as well as its only director, officer and employee. *See* Motion at 2, ¶ 3. Amato P.C. was established as a New York professional service corporation at 101 West 23rd Street in New York City in 1997.

---

if not buttressed by extrinsic evidence.

*See id*. ¶ 4; Exh. 2 thereto.  Dr. Amato is the only shareholder, officer and employee of Amato P.C. *See* Motion at 2, ¶ 5.

Each subpoena indicated that it was issued under the authority of 18 U.S.C. § 3486 and that production of documents and materials listed in an attachment (Attachment A) was necessary in the performance of the responsibility of the U.S. Department of Justice to investigate federal health-care offenses, defined in 18 U.S.C. § 24(a) to mean violations of, or conspiracies to violate, certain enumerated statutes if the violation or conspiracy relates to a health-care benefit program, as defined in 18 U.S.C. § 24(b).  *See id*. at 3-4, ¶ 10; Subpoenas.[3]  Each subpoena required the "Custodian of the Records" of the corporation to appear at the United States Attorney's Office in Portland, Maine on February 28, 2005 and produce the items listed on Attachment A; however, a box was checked indicating that in lieu of an appearance, compliance could be accomplished by delivering the requested records to the United States Attorney's Office prior to the appearance date.  *See* Motion at 4, ¶ 11 & 9, ¶¶ 17-18; Subpoenas. Each subpoena instructed, in relevant part:

1.  Scope of search required: This subpoena calls for all documents in your possession, custody or control regardless of their present location or place of storage. You are required to search all files reasonably likely to contain responsive documents, including files left behind by former officers, directors, agents and employees.[4]

2.  All documents provided are to be original documents.  <u>Please complete and sign the attached Certificate of Authenticity of Business Records and return it with the records requested by this subpoena.</u> . . .[5]

---

[3] A "health care benefit program" is defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."  18 U.S.C. § 24(b).

[4] The term "document(s)" was defined to mean, "without limitation, any written, printed, typed, photographed, recorded or otherwise reproduced or stored communication or representation, whether comprised of letters, words, numbers, pictures, sounds or symbols, and any copies of documents contemporaneously or subsequently created which have any non-conforming notes or other markings and the reverse side of any communication or representation which also contain any of the above."  Motion at 6, ¶ 13; Attachment A to Subpoenas, Definitions, ¶ 3.

[5] The attached certificates of authenticity asked the custodian of the records of each of the corporations to state, under penalty of criminal punishment for false statement or attestation, (i) his name, employer and official title, (ii) in whose custody each of the records provided was maintained, (iii) that each of the records was made at or near the time of occurrence of the matters set forth, by (or from (*continued on next page*)

3

3.      For each document produced pursuant to this subpoena, please identify the subpoena subparagraph to which it is responsive.  If no documents or other information exist that are responsive to a given specification, provide a statement to that effect at the time of production.

4.      If you assert a claim of privilege or immunity in response to any document called for by this subpoena, and if on the basis of your claim you refrain from producing such document or any part thereof, then for each such document and part thereof that you do not produce, please provide a privilege log wherein (1) you refer to the specific subparagraph of this subpoena to which the document or part thereof is responsive, and (2) you identify (a) the type of document or part of a document being withheld . . ., (b) its contents (summarized), (c) its author(s), (d) all actual and intended recipients of the document or evidence, (e) its date, and (f) the specific privilege or immunity being asserted, all with sufficient particularity so as to allow the United States Department of Justice, and potentially the Court, to assess the validity of the claimed privilege or immunity.

5.      If any document, information or data called for by this subpoena exists as, or can be retrieved from, information stored in electronic form, then you are directed to produce the information in electronic form as well as the paper form, including sufficient identification of the applicable software program to permit access to, and use of, the document or data, programming instructions, record layout, and any other material necessary for the retrieval of such information.

6.      Relevant time period: Unless otherwise specified below, the relevant time period for each document request in this subpoena shall be **January 1, 2000 to present**.

Motion at 7-8, ¶ 14; Attachment A to Subpoenas, Instructions, ¶¶ 1-6 (emphasis in original).

The Subpoenas commanded that the following be produced:

1.      All documents that describe the ownership, legal status, and organizational structure of [Mainecures or Amato P.C.], and all corporate records of that entity, including organizational charts, articles of organization and amendments thereto, statements of officers, annual reports, copies of stock certificates, minutes of board of directors meetings, and similar documentation.

---

information transmitted by) a person with knowledge of those matters, and was kept in the course of a regularly conducted business activity, (iv) that the business activity made such records as a regular practice, and (v) that if such record was not the original, it was a duplicate of the original.  *See* Motion at 8-9, ¶ 16; Attachment A to Subpoenas, Certificate of Authenticity of Business Records.

2.      All medical records or patient charts which reflect services provided to patients covered by any health care benefit program for the time period described above, including but not limited to intake data, personal information data sheets, x-rays, progress notes, doctors' orders, and supporting documentation.  To the extent that a particular medical record or patient chart includes information dated prior to January 1, 2000 along with information dated after January 1, 2000, the entire record should be produced.

3.      Provider copies of all claim forms submitted to healthcare benefit programs.

4.      All remittance statements, Explanations of Medical Benefits (EOMB) forms, and similar documentation pertaining to payments from health care benefit programs.

5.      All correspondence, e-mails, or records of contact with any healthcare benefit programs.

6.      All billing instructions, manuals, correspondence, and other guidance pertaining to any health care benefit programs.

7.      Any records pertaining to the training of, or instructions given to, employees, officers, agents, or sub-contractors of [Mainecures or Amato P.C.] regarding the billing of services to healthcare benefit programs.

8.      All cash receipts and cash disbursement records, including bank statements, canceled checks, deposit tickets, general ledgers, journals, and all supporting documentation.

9.      Any financial statements, trial balances, and copies of state and federal tax returns of [Mainecures or Amato P.C.].

10.     The following computer-related items:

a.      Any computer equipment and storage device capable of being used to commit, further, or store documents or data described above;

b.      Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c.      Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

>    d.    Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.
>
>    e.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;
>
>    f.    Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data;
>
>    and
>
>    g.    Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data[.]

> Item #10 does not include any equipment or storage devices that law enforcement agencies assigned to this matter have already made a copy or mirror image thereof.

Motion at 4-6, ¶ 12; Attachment A to Subpoenas, Records To Be Produced, ¶¶ 1-10.

Each subpoena warned that "[f]ailure to comply with the requirements of this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience."  Motion at 8, ¶ 15; Subpoenas.

On February 23, 2005 Assistant United States Attorney James W. Chapman assented to an extension of time for production of records pursuant to the Subpoenas, setting a new deadline for production of April 1, 2005.  *See* Motion at 9, ¶ 19.  As of the date of filing of the Opposition (April 21, 2005) neither Dr. Amato, his counsel nor any designated custodian had produced any corporate records pursuant to the Subpoenas.  *See* Opposition at 3.[6]

## II.  Analysis

The United States Attorney's Office issued the Subpoenas pursuant to 18 U.S.C. § 3486, enacted as part of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") "to

facilitate enforcement of federal statutes relating to healthcare fraud and abuse and thereby to promote the availability and affordability of health insurance in the United States." *In re Subpoena Duces Tecum (United States v. Bailey)*, 228 F.3d 341, 346 n.1 (4th Cir. 2000) (citation and internal quotation marks omitted).

Section 3486 authorizes the Attorney General, in any investigation relating to a federal health-care offense, to issue an administrative subpoena requiring "the production of any records or other things relevant to the investigation" and "testimony by the custodian of the things required to be produced concerning the production and authenticity of those things." 18 U.S.C. § 3486(a)(1)(B). Such subpoenas must, *inter alia*, "describe the objects required to be produced and prescribe a return date within a reasonable period of time within which the objects can be assembled and made available." *Id*. § 3486(a)(2). The person or entity summoned may, "[a]t any time before the return date specified in the summons, . . . in the United States district court for the district in which that person or entity does business or resides, petition for an order modifying or setting aside the summons[.]" *Id*. § 3486(a)(5). A summons issued pursuant to section 3486 "shall not require the production of anything that would be protected from production under the standards applicable to a subpoena duces tecum issued by a court of the United States." *Id*. § 3486(a)(7).[7]

As Dr. Amato points out, "[s]upoenas *duces tecum* have been quashed when they are overbroad in their request, when they seek irrelevant or privileged matters or if they constitute an unreasonable search and seizure within the prohibition of the Fourth Amendment." Motion at 10 (quoting *In re Grand Jury Subpoena (Soto-Davila)*, 96 F.R.D. 406, 407 (D.P.R. 1982)). He

---

[6] Presumably, no such records have yet been produced given the pendency of the Motion.

[7] In construing section 3486, the United States Court of Appeals for the Sixth Circuit observed, "It is safe to assume that Congress, in passing HIPAA, recognized the serious problem that health care fraud had become, and that, through this legislation, Congress was intending to strike back at this problem. Accordingly, in light of both the statutory language and legislative history of § 3486, it appears that Congress intended to give the Attorney General broad authority to conduct health care fraud investigations[.]" *In re Administrative Subpoena (Doe v. United States)*, 253 F.3d 256, 267 (6th Cir. 2001).

acknowledges that the initial burden of establishing the defective character of the Subpoenas rests on him. *See id.; see also, e.g., Soto-Davila*, 96 F.R.D. at 407 ("[T]he burden to establish, at least initially, the defects in the subpoena is on the moving party since grand jury proceedings have a presumption of regularity."). In essence, Dr. Amato asks the court to set aside the Subpoenas on both Fifth and Fourth amendment grounds. *See* Motion at 1. For the reasons discussed below, I conclude that his Fifth Amendment argument is without merit and that his Fourth Amendment challenge fails except insofar as he contends that paragraph 10 of the "Records To Be Produced" section of the Subpoenas (describing computer-related items) is overbroad.

## A.    Fifth Amendment Challenge

The Fifth Amendment provides, in pertinent part, that no person "shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. As Dr. Amato acknowledges, the Fifth Amendment bars only the compulsion of testimony; it does not shield a subpoena-target from turning over extant documents, however incriminating their contents. *See* Motion at 11; *United States v. Hubbell*, 530 U.S. 27, 35-36 (2000) ("[A] person may be required to produce specific documents even though they contain incriminating assertions of fact or belief because the creation of those documents was not 'compelled' within the meaning of the privilege [against self-incrimination].").

Nonetheless, as Dr. Amato points out, *see* Motion at 11, the Supreme Court has recognized that "the act of producing documents in response to a subpoena may have a compelled testimonial aspect[,]" *Hubbell*, 530 U.S. at 36. He posits that, pursuant to this "act of production" doctrine, he cannot be compelled to (i) admit that certain documents exist or do not exist, are in his possession or control or are authentic and/or (ii) provide to prosecutors the potentially incriminating detail the Subpoenas require to claim a privilege or immunity. *See* Motion at 10-12; *Hubbell*, 530 U.S. at 36-37 ("We have held that the act of production itself may implicitly communicate statements of fact. By

8

producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic.") (footnote and internal quotation marks omitted).

I find no fault with Dr. Amato's *Hubbell* argument as a self-contained proposition.  But as he himself recognizes, in view of the fact that the Subpoenas were addressed to the custodian of corporate records and not to him personally, he confronts a significant (and, in my view, ultimately fatal) linkage problem: "Historically, the Supreme Court has not applied the Fifth Amendment protections to a custodian of corporate records because the custodian acts in his representative (as opposed to his personal) capacity when producing materials in response to a subpoena *duces tecum*." Motion at 12; *see also, e.g., Bellis v. United States*, 417 U.S. 85, 88 (1974) (observing that a "long line of cases has established that an individual cannot rely upon the privilege [against self-incrimination] to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if these records might incriminate him personally.").

In the face of this obstacle, Dr. Amato invites the court to take "incisive judicial action[,]" Reply at 4, and recognize an exception in a case such as this in which the custodian of corporate records is both the target of an investigation and the corporation's sole employee, officer and shareholder (in other words, "the functional equivalent of a sole proprietor[,]" Motion at 14).  He grounds this invitation on dictum in a footnote in *Braswell v. United States*, 487 U.S. 99 (1988).  *See* Reply at 6-7 & n.4.  In *Braswell*, the Supreme Court rebuffed an argument almost identical to that of Dr. Amato, holding that the president of two small corporations could not claim an "act of production" Fifth Amendment privilege in response to a subpoena *duces tecum* directed to him in his capacity as custodian of corporate records.  *See Braswell*, 487 U.S. at 100-01.[8]  The Court observed, *inter alia*:

_____

[8] Braswell was the sole shareholder of the two corporations in question.  *See Braswell*, 487 U.S. at 101.  In compliance with (*continued on next page*)

> Had petitioner conducted his business as a sole proprietorship, [*United States v.*] *Doe*[, 465 U.S. 605 (1984)] would require that he be provided the opportunity to show that his act of production would entail testimonial self-incrimination.  But petitioner has operated his business through the corporate form, and we have long recognized that, for purposes of the Fifth Amendment, corporations and other collective entities are treated differently from individuals.  This doctrine – known as the collective entity rule – has a lengthy and distinguished pedigree.

*Id*. at 104.  Of particular significance given the context of the instant case, the Court observed: "We note further that recognizing a Fifth Amendment privilege on behalf of the records custodians of collective entities would have a detrimental impact on the Government's efforts to prosecute 'white-collar crime,' one of the most serious problems confronting law enforcement authorities."  *Id*. at 115 (footnote omitted).  Nonetheless, in the footnote on which Dr. Amato relies, the Court stated: "We leave open the question whether the agency rationale supports compelling a custodian to produce corporate records when the custodian is able to establish, by showing for example that he is the sole employee and officer of the corporation, that the jury would inevitably conclude that he produced the records."  *Id*. at 118-19 n.11.

Even assuming *arguendo* that this court would otherwise be tempted to blaze this trail, the question left open in *Braswell* has been answered – in the negative – by the First Circuit.  In *United States v. Lawn Builders of New England, Inc*., 856 F.2d 388 (1st Cir. 1988), decided on the heels of *Braswell*, the First Circuit rejected the attempt of James Shadoian, the president of a small corporation, to claim a Fifth Amendment "act of production" privilege with respect to an IRS summons directed to his corporation and to him in his capacity as its president.  *See Lawn Builders*, 856 F.2d at 393.  The court noted that Shadoian raised, for the first time on appeal, the contention that Lawn Builders was a "one-man corporation" (despite evidence that the corporation was co-owned by

---

Mississippi law, both corporations had three directors – Braswell, his wife and his mother.  *See id*.  Although Braswell's wife and mother served as secretary-treasurer and vice-president of the corporations, neither had any authority over the corporations' business affairs.  *See id*.

himself and his brother).  *Id.* at 394.  However, rather than deeming the argument waived, the court

addressed its merits, ruling: "In any event, even assuming Lawn Builders to be a one-man corporation

and James T. Shadoian to be that one man, the corporate records are not shielded from production, nor

may Shadoian resist a subpoena for those records on the ground that the act of production would

impermissibly infringe on his Fifth Amendment right against self-incrimination."  *Id*.  For this

proposition it cited both *Braswell* and one of its own then recently decided cases, *In re Grand Jury*

*Proceedings (John Doe Co.)*, 838 F.2d 624 (1st Cir. 1988), in which it held:

> The corporation's claim that it should be treated differently because it is a one-man
> corporation, similar to a sole proprietorship, is of no avail.  It is well settled that no
> privilege can be claimed by the custodian of corporate records, regardless of how
> small the corporation may be.  It was Owner's choice to incorporate.  With that choice
> came all the attendant benefits *and responsibilities* of being a corporation.  One of
> those responsibilities is to produce and authenticate records of the corporation when
> they are subpoenaed by a grand jury.  How the corporation choses [sic] to fulfill this
> duty is not the court's concern.

*John Doe*, 838 F.2d at 627 (citations and internal quotation marks omitted) (emphasis in original).

Thus, the First Circuit has spoken to the precise issue presented by Dr. Amato, and nothing in

the *Braswell* dictum on which he relies has thrown its views into question.[9]  Dr. Amato made his

choice to incorporate Mainecures and Amato P.C.; he cannot now claim a Fifth Amendment privilege

with respect to subpoenas *duces tecum* directed to the custodian of records of those corporations.[10]

---

[9] Four years after the issuance of *Lawn Builders*, the First Circuit noted in passing that in *Braswell* the Supreme Court had "left open the question whether the privilege might apply when the custodian is able to establish, by showing for example that he is the sole employee and officer of the corporation, that the jury would inevitably conclude that he produced the records."  *In re Grand Jury Subpoena*, 973 F.2d 45, 47 n.3 (1st Cir. 1992) (citation and internal quotation marks omitted).  However, this simple, accurate observation hardly casts doubt on the holdings of *Lawn Builders* and *John Doe*.  To the contrary, in *Grand Jury* the court rejected the appellant's argument that for purposes of his claim to a Fifth Amendment "act of production" privilege the nominee trust he and his brother had created to engage in real-estate transactions was akin to a sole proprietorship or joint tenancy.  *See Grand Jury*, 973 F.2d at 48.

[10] The United States District Court for the District of Massachusetts likewise has read *Lawn Builders* as "foreclos[ing] [the] possibility" left open in the *Braswell* footnote.  *See Digital Equip. Corp. v. Currie Enters*., 142 F.R.D. 8, 16 (D. Mass. 1991).  Inasmuch as appears, no court considering the question has applied the *Braswell* footnote to excuse a corporate records custodian from complying with a subpoena.  *See, e.g., United States v. Stone*, 976 F.2d 909, 912 (4th Cir. 1992); *SEC v. Bremont*, No. 96 CIV.8771 (LAK), 1997 WL 225803, at *1 (S.D.N.Y. May 6, 1997).

Dr. Amato makes one last bid for recognition of a Fifth Amendment privilege in his favor, at least as concerns the subpoena directed to Mainecures.  He contends that in view of Mainecures' 2003 administrative dissolution, (i) he no longer holds a representative capacity with respect to that corporation, and (ii) to the extent that any relevant responsive records and other materials exist, they are now associated with a sole proprietorship.  *See* Motion at 12-13; Reply at 7 ("The Government tempts the Court to ignore the fact that, to the extent that Mainecures once held any responsive documents, all of its corporate records underwent an important metamorphosis when they were effectively transferred to Dr. Amato's sole proprietorship when Mainecures was administratively dissolved in 2003.") (footnote omitted).

He analogizes his situation to that of several former corporate employees who, in *In re Three Grand Jury Subpoenas Duces Tecum Dated Jan. 29, 1999 (United States v. Doe #1)*, 191 F.3d 173 (2d Cir. 1999), prevailed in arguing that they had a right to assert a Fifth Amendment privilege to refuse to respond to grand-jury subpoenas demanding that they produce documents in their custody that were created during the course of their employment.  *See* Motion at 12; *Three Subpoenas*, 191 F.3d at 175, 183-84.  As the government notes, *see* Opposition at 12-13, *Three Subpoenas* is materially distinguishable from the instant case.  There is no evidence that Dr. Amato resigned his corporate position, as had the employees in *Three Subpoenas*.  *Compare Three Subpoenas*, 191 F.3d at 175, 181.  Indeed, as the government points out, *see* Opposition at 12, Mainecures apparently still continued to do business as late as October 2004, *see* Exh. 1 thereto (Berkley Administrators of CT, Inc., Explanation of Review form).

In any event, as the government notes, even accepting the dissolution of Mainecures at face value, by operation of Maine law a dissolved corporation continues to exist for three years from the date of its dissolution for purposes of winding up and liquidating its business affairs.  *See* Opposition

at 13; 13-C M.R.S.A. § 1406(1).  Dr. Amato's colorful arguments notwithstanding, the dissolution of a corporation pointedly does not effectuate a "metamorphosis," or transfer of title to, its property.  *See* 13-C M.R.S.A. § 1406(2)(A) ("Dissolution of a corporation does not . . . [t]ransfer title to the corporation's property[.]").  Nor does such dissolution "[p]revent commencement of a proceeding by or against the corporation in its corporate name" or "[t]erminate the authority of the clerk of the corporation."  *Id*. § 1406(2)(E) & (G).

As the government suggests, important policy considerations underlie provisions such as this: "To find otherwise would create a powerful incentive for corporate officers to dissolve their corporations when they become targets of an investigation and would contravene the policy behind the collective entity rule preventing corporations from claiming the Fifth Amendment privilege from compulsory production of business documents."  Opposition at 13; *see also, e.g., Bellis,* 417 U.S. at 96 n.3 ("Petitioner properly concedes that the dissolution of the partnership does not afford him any greater claim to the privilege [against self-incrimination] than he would have if the firm were still active.  Under Pennsylvania law, dissolution of the partnership does not terminate the entity; rather it continues until the winding up of the partnership affairs is completed, which has not yet occurred in this case.  Moreover, this Court's decisions have made clear that the dissolution of a corporation does not give the custodian of the corporate records any greater claim to the Fifth Amendment privilege.") (citations omitted); *Wheeler v. United States*, 226 U.S. 478, 490 (1913) (holding books and papers of dissolved corporation subject to grand jury's subpoena *duces tecum* despite argument of its former officers that objects now belonged to them personally; noting that privilege of individuals against self-incrimination did not "prevent the compulsory production of the books of a corporation with which they happen to be or have been associated.").

Inasmuch as Mainecures' 2003 dissolution does not, at least at this juncture, end Dr. Amato's status as a representative of the corporation, alter the character of Mainecures' records or prevent Mainecures from being subject to proceedings against it in its corporate name, Dr. Amato may not, on the basis of its dissolution, assert a Fifth Amendment privilege with respect to the subpoena directed to the custodian of the records of Mainecures.[11]

I note that, while it may be of cold comfort to Dr. Amato, the Supreme Court recognized some measure of protection for records custodians who fear incrimination as a result of compliance with subpoenas *duces tecum*:

> Although a corporate custodian is not entitled to resist a subpoena on the ground that his act of production will be personally incriminating, we do think certain consequences flow from the fact that the custodian's act of production is one in his representative rather than personal capacity. Because the custodian acts as a representative, the act is deemed one of the corporation and not the individual. Therefore, the Government concedes, as it must, that it may make no evidentiary use of the "individual act" against the individual. For example, in a criminal prosecution against the custodian, the Government may not introduce into evidence before the jury the fact that the subpoena was served upon and the corporation's documents were delivered by one particular individual, the custodian.

---

[11] Dr. Amato makes what appears to be one final, separate Fifth Amendment argument, contending that the Subpoenas should be treated as interrogatories to the extent that they seek to compel testimony from him – for example, confirmation that the government has seized all responsive records and detailed information concerning any withheld documents with respect to which the corporations might elect to assert a privilege. *See, e.g.*, Reply at 1-4. The government's request for testimony of this nature does not convert the Subpoenas into *de facto* interrogatories or otherwise exceed the bounds of what permissibly may be asked of a records custodian in his or her representative capacity. Section 3486 explicitly contemplates that a custodian of records may be asked to testify concerning their production and authenticity. *See* 18 U.S.C. § 3486(a)(1)(B)(ii). Moreover, the First Circuit has held that a corporate records custodian may be compelled to provide sworn testimony authenticating documents or verifying that he does not possess them. *See, e.g., John Doe*, 838 F.2d at 626 ("perceiv[ing] no significant distinction between authentication provided orally and the same provided by some other physical act"; holding, "Since production, including implied authentication, can be required of a corporation through a corporate officer regardless of the potential for self-incrimination, production including oral authentication can also be required."); *Lawn Builders*, 856 F.2d at 394 ("[W]hen an agent of a corporation fails to produce documents that are the subject of a valid summons, he must give sworn testimony that he does not possess them. A statement of non-possession is auxiliary to the duty to comply with the summons and that statement is not subject to any Fifth Amendment privilege.") (citations omitted). With respect to Dr. Amato's complaint that, were one of the corporations to seek to interpose a privilege, he would be required to provide detailed testimony, such testimony again would merely be incidental to his status and responsibilities as corporate records custodian. As is well-settled, the proponent of a privilege bears the burden of demonstrating entitlement to its protection. *See, e.g., In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003) ("Despite a grand jury's vaunted right to every man's evidence, it must, nevertheless, respect a valid claim of privilege. But the party who invokes the privilege bears the burden of establishing that it applies to the communications at issue and that it has not been waived.") (citations omitted).

*Braswell*, 487 U.S. at 117-18.[12]

## B. Fourth Amendment Challenge

Dr. Amato alternatively attacks the Subpoenas on Fourth Amendment grounds, asserting that they are overbroad and burdensome. *See* Motion at 1, 15-22. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Pursuant to the Fourth Amendment, a subpoena *duces tecum* may be quashed or modified "if compliance would be unreasonable or oppressive." *Stern v. United States Dist. Court for Dist. of Mass.*, 214 F.3d 4, 17 (1st Cir. 2000). A subpoena is not unreasonable or oppressive "if the proponent establishes relevancy, admissibility, and specificity." *Id.*; *see also, e.g., United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1996) ("The requirements for enforcement of an administrative subpoena are not onerous. In order to obtain judicial backing the agency must prove that (1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena.") (footnote omitted); *In re Grand Jury Matters (Appeal of United States)*, 751 F.2d 13, 18 (1st Cir. 1984) ("In the absence of privilege, courts normally will ask only whether the materials requested are relevant to the investigation, whether the subpoenas specify the materials to be produced with reasonable particularity, and whether the subpoena commands production of materials covering only a reasonable period of time.").

---

[12] The government suggests that Dr. Amato's concerns can be assuaged by appointment of a substitute custodian for purposes of responding to the Subpoenas, *see* Opposition at 10-11 – a proposal that Dr. Amato rejects as unhelpful and unworkable, *see* Reply at 9 ("this approach employs a wolf in sheep's clothing"). This particular squabble is beyond the court's purview. *See, e.g., John Doe*, 838 F.2d at 627 ("How the corporation choses [sic] to fulfill this duty [to respond to a subpoena] is not the court's concern.").

Dr. Amato's burdensomeness argument has two facets: (i) burden as a result of overbreadth (what one might term "facial" burdensomeness) and (ii) burden in terms of resources he must expend to comply with the Subpoenas (what one might term "as applied" burdensomeness).  *See* Motion at 15-22.[13]  With respect to the latter, he argues:

> The subpoenas are unduly burdensome not only in terms of the resources necessary to identify records which are responsive, but also because the apparent nature of the Government's inquiry – for example, it is obvious that the Government is already alert for any appearance of obstruction of justice, real or imagined – imposes awesome potential consequences upon Dr. Amato.  For example, if Dr. Amato inadvertently fails to produce certain documents, he may be prosecuted by the Government if the documents surface later because of the required certification of completeness that must be made when production occurs.

Motion at 21.

As the government suggests, Dr. Amato's as-applied argument simply is too conclusory to meet his burden of demonstrating the defectiveness of the Subpoenas – particularly in view of the fact that his Damariscotta office and a vehicle already have been searched for similar items pursuant to the earlier issued search warrant.  *See* Opposition at 5; *see also, e.g.,  In re Grand Jury Subpoenas Duces Tecum Dated Jan. 30, 1986*, 638 F. Supp. 794, 795-96 (D. Me. 1986) (in view of fact that movant had previously caused many of the requested documents to be culled from his records in response to an earlier subpoena seeking similar records and had produced no fresh evidence of difficulty of required task, he fell short of demonstrating that compliance with subpoenas would be

---

[13] Dr. Amato also posits that inasmuch as the Subpoenas require the custodian to search all files reasonably likely to contain responsive documents and to produce original documents, they amount to "a constructive search" that cannot be accomplished in the absence of a search warrant or an exception to the warrant requirement.  *See* Motion at 16.  This argument, which ignores well-recognized distinctions between searches and subpoenas, is plainly without merit.  *See, e.g., Bailey*, 228 F.3d at 348 ("[T]he immediacy and intrusiveness of a search and seizure conducted pursuant to a warrant demand the safeguard of demonstrating probable cause to a neutral judicial officer before the warrant issues, whereas the issuance of a subpoena initiates an adversary process that can command the production of documents and things only after judicial process is afforded. . . .  If Bailey were correct in his assertion that investigative subpoenas may be issued only upon probable cause, the result would be the virtual end to any investigatory efforts by governmental agencies, as well as grand juries."); *In re Grand Jury Proceedings Involving Vickers*, 38 F. Supp.2d 159, 164 (D.N.H. 1998) ("[I]t is important to remember that even when a citizen's Fourth Amendment rights are arguably implicated by a grand jury's subpoena, the relevant inquiry is *not* whether the subpoena is supported by 'probable cause.'  Instead, the court must simply (*continued on next page*)

unduly burdensome).[14]  What is more, the potential consequences of which Dr. Amato complains not only are speculative but also are no different in magnitude or kind from those a respondent to a section 3486 subpoena typically might face.  *See, e.g.*, 18 U.S.C. § 3486(a)(1)(B)(ii) (attorney general may require a custodian of records to give testimony  "concerning the production and authenticity" of requested records).  Dr. Amato's as-applied burdensomeness argument accordingly fails.

I turn finally to what I have termed Dr. Amato's facial burdensomeness contention: that the Subpoenas are overbroad.[15]  The Subpoenas seek ten categories of materials.  While, as Dr. Amato notes, all ten categories contain terms such as "any" and "all," which can be "indicia of a fishing expedition[,]" *see* Motion at 20-21; *United States v. Jackson*, 155 F.R.D. 664, 668 (D. Kan. 1994), I agree with the government that the first nine categories are sufficiently specific, limited and relevant to pass muster, *see* Opposition at  3-4.  All of these categories seek documents only of the specified corporation for the period January 1, 2000 to the present.  All but categories 1, 8 and 9 are expressly limited to production of documents relating to "health care benefit programs" – the precise programs with respect to which section 3486 aims to curb wasteful fraud and abuse.  Categories 1, 8 and 9 seek the organizational and financial documents of the specific corporation (again, only for the relevant time period).   Health-care fraud is a financial crime;  such documents bear on receipts and disbursements related to health-care benefit programs.

---

determine whether the subject matter and scope of the subpoena are reasonable under the circumstances, including consideration of the subpoenaed person's constitutional rights.") (emphasis in original).

[14] The government further addresses the burdensome argument by proposing that to the extent any documents responsive to the Subpoenas already were seized by the government in its search, Dr. Amato, his counsel or any designated surrogate custodian of records need not physically produce such documents but need only indicate the Bates-stamped number of the record and the subpoena paragraph(s) to which the documents are responsive.  *See* Opposition at 5-6.  Again, it is up to Dr. Amato whether he desires to take the government up on this offer.

[15] In a footnote, Dr. Amato raises what might be construed as a challenge to the relevance of the Amato P.C. records, noting: "It appears that the focus of the Government's scrutiny is on Dr. Amato's work in Maine, as opposed to New York, which raises the question of whether its demand for records of Dr. Steven P. Amato, D.C., P.C., is relevant to the investigative inquiry."  Motion at 13 n.23.  While the Subpoenas were issued in Maine, they contain no limitation to investigation of potential crimes in Maine.  *See* Subpoenas.  Rather, their avowed focus is the investigation of federal health-care offenses.  *See id.*  Thus, I perceive no relevance problem in the request for records of the New York-based corporation.

Thus, with respect to these categories of document requests, the government demands "production of [relevant] materials covering only a reasonable period of time." *Grand Jury Matters*, 751 F.2d at 18; *see also, e.g., Bailey,* 228 F.3d at 350-51 (if physician served with section 3486 subpoena had treated 15,000 patients over period of seven years and all of them were reimbursed on claims he submitted, a suspicion of fraud on these claims would justify review of his documentation of services to these patients, of claims submitted on their behalf and of reimbursements collected; "to define the reasonableness of a subpoena based on the volume of items identified for production would be to require the government to ascertain, before issuing a subpoena, the extent of any wrongdoing. But ascertaining the extent of wrongdoing is itself a primary purpose for the issuance of the subpoena."); *Grand Jury*, 638 F. Supp. at 795-96 (subpoenas requesting psychiatrist's records for four-year period in health-care fraud investigation not overbroad despite necessity that psychiatrist review all 2,500 patient files to gather information).

I reach a different conclusion with respect to Category 10. As Dr. Amato points out, *see* Motion at 17-18, the government in effect seeks all of the computer equipment of the named corporation, regardless whether the contents do or do not arguably relate to health-care benefit program fraud and abuse. For example, Category 10(a) calls for production of "[a]ny computer equipment and storage device *capable of being used* to commit, further, or store documents or data described above[.]" Attachment A to Subpoenas, Records To Be Produced, ¶ 10(a) (emphasis added). Presumably, *any* computer equipment and storage device is *capable of* storing such data. Thus, the custodian of the records would be required to turn over all corporate computers and storage devices, even if (for example) they stored only such personal papers as wills and short stories. Likewise, Category 10(b) seeks "[a]ny computer equipment used to facilitate the transmission, creation, display, encoding or storage *of data*, including word processing equipment, modems,

docking stations, monitors, printers, plotters, encryption devices, and optical scanners[.]"  *Id.* ¶ 10(b) (emphasis added).  This category does not seek computer equipment used to transmit, store or create data relating, for example, to health-care benefit programs for the specified time period, but rather seeks any computer equipment used to transmit, store or create "data" – period.[16]

In its Opposition, the government offers no justification for the breadth of its computer request; indeed, it makes no reference whatsoever to this fairly prominent aspect of Dr. Amato's Fourth Amendment argument.  *See* Opposition at 3-6.

While courts have been sensitive to the practical difficulties computer searches pose for law-enforcement agencies, inasmuch as appears most courts considering the issue (including this one) have deemed overbroad a warrant to seize all of a target's computer equipment in the absence of any further express limitation on the parameters of an off-site search and seizure.  *See, e.g., United States v. Pellicano*, No. 04-50043, 2005 WL 1368077, at *2 (9th Cir. June 5, 2005) (search warrant was not overbroad when, "consistent with our previous cases in which we approved the seizure and off-site examination of computer equipment to identify evidence within the scope of a warrant," it permitted agents to review each file to determine whether it fell within scope of items to be seized but authorized seizure only of those files related to categories described in warrant); *United States v. Riccardi,* 405 F.3d 852, 862 (10th Cir. 2005) ("Our case law . . . suggests that warrants for computer searches must affirmatively limit the search to evidence of specific federal crimes or specific types of material.  The warrant in this case was not limited to any particular files, or to any particular federal crime.  The warrant authorized the 'seizure' of Mr. Riccardi's computer[.]") (citation omitted); *United States v. Clough*, 246 F. Supp.2d 84, 87 (D. Me.), *modified on other grounds*, 255 F. Supp.2d 3 (D. Me. 2003) (search warrant authorizing search of seized computers was overbroad when "there were

---

[16] Inasmuch as appears, the only relevant overarching limitation that applies to Category 10 is the limitation to the time period from (*continued on next page*)

no restrictions on the search, no references to statutes, and no references to crimes or illegality.  The omission seems likely to have been a clerical error, . . . but the scope of the warrant as written is clearly excessive, and no justification was provided for such an unlimited search.  The whole point of a warrant is to make general searches impossible."); *United States v. Hunter*, 13 F. Supp.2d 574, 583-84 (D. Vt. 1998) (recognizing that, as practical matter, agents would have to seize computer and search it off-site, but holding overbroad a catchall section of search warrant that simply called for seizure of all computers without specifying purpose for which they were seized or delineating the limits of their subsequent search); *but see United States v. Maali*, 346 F. Supp.2d 1226, 1245-46 (M.D. Fla. 2004) (disagreeing with *Hunter* line of cases in holding, "[T]he lack of a detailed computer 'search strategy' does not render the warrant deficient as to the search and seizure of computers.").  At least one court has applied similar reasoning in holding overbroad a computer-related demand of a subpoena *duces tecum*.  *See In re Grand Jury Subpoena Duces Tecum Dated Nov. 15, 1993*, 846 F. Supp. 11, 12-13 (S.D.N.Y. 1994) (grand jury subpoena *duces tecum* demanding computer hard drives and floppy discs that contained concededly irrelevant data was overbroad, particularly in view of government's acknowledgement that key-word search would reveal which documents were likely to be relevant to investigation).  I discern no reason why, for purposes of overbreadth analysis, the off-site search of computer equipment obtained as a result of a subpoena should be treated differently from the off-site search of equipment seized pursuant to a search warrant.

Inasmuch as Category 10 of the Subpoenas in essence requests the turnover of all computers (and related objects) of both corporations with no express safeguard against a subsequent rummaging through, and seizure of, irrelevant as well as relevant data, it cannot withstand Fourth Amendment reasonableness scrutiny.

---

January 1, 2000 to the present.  *See* Attachment A to Subpoenas.

### III.  Conclusion

For the foregoing reasons, Dr. Amato's motion to quash is denied except insofar as it pertains to Category 10 of the section titled "Records To Be Produced" in both Subpoenas.  The Subpoenas are hereby modified to exclude that category.

So ordered.

Dated this 17th day of June, 2005.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge